UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
MOROCCANOIL, INC.,                              :

                Plaintiff,          :     Case No. 1:20-cv-06489 (ALC)

    -against-                                 :

TAL SARAH ESHKOLI and ESHKOLI              :
PROMOTIONS & PRODUCTIONS LTD.,
                                                  :
                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -- x

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS**

Defendants Tal Sarah Eshkoli ("Eshkoli") and Eshkoli Promotions & Productions Ltd. ("EPP") (collectively, "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss based on lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), or in the alternative, based on forum non conveniens.

**PRELIMINARY STATEMENT**

This case centers around a Hebrew-language agreement (the "EPP Agreement") negotiated and signed in Israel between two Israeli entities, Moroccanoil Israel Ltd. ("Moroccanoil Israel") and EPP. The EPP Agreement provided that Moroccanoil Israel would pay EPP commissions (in the Israeli currency of New Israeli Shekels) for initiating and brokering a long-term sponsorship agreement relating to the Eurovision Song Contest ("Eurovision"), a European singing competition that is widely followed in Israel and throughout Europe, and for strategic consulting services to be provided in connection with that sponsorship over ten years. Although the EPP Agreement provided that EPP would receive its compensation even if the EPP Agreement were terminated for any reason, Moroccanoil Israel refused to pay EPP the consideration required under the agreement after deciding to stop using EPP's services further.

Less than a week after the parties unsuccessfully attempted to mediate their dispute in Israel and while Defendants' lawyer was trying to create one more dialogue with Moroccanoil Israel and preparing to bring suit in Israel if necessary, Moroccanoil Israel's American affiliate, Plaintiff Moroccanoil, Inc. ("Plaintiff"), which is not a party to the EPP Agreement, raced to bring suit here in New York against EPP and its manager Eshkoli (who is also not even a party to the contract). Although never named in the EPP Agreement, Plaintiff claimed rights as a purported third-party beneficiary of the contract. Shortly thereafter, EPP filed suit against Moroccanoil Israel in Israel for breach of contract (the "Israeli Litigation"), and that case is currently pending with the next preliminary conference set for March 2021 following the scheduled completion of discovery.

Plaintiff's lawsuit is a brazen attempt to bully and gain leverage over a much smaller entity by forcing it to litigate in a distant, inconvenient forum with no meaningful connections to the dispute. Defendants have no contacts with New York, and the underlying Hebrew-language contract on which this case turns fails to involve any of the kind of purposeful activities focused on New York that is required under the case law to constitute a transaction of business in New York under its long-arm statute. There were no negotiations in New York, no visits to New York either before or after the contract, no New York parties to the underlying agreement and no relevant New York activities or connections associated with EPP's performance of its obligations relating to the sponsorship of an event that has little or no recognition or significance to an American audience.

Plaintiff's complaint strives to invent some basis for jurisdiction here by insisting that there were foreseeable consequences in New York because it, rather than its Israeli affiliate, ultimately signed the sponsorship agreement (the "Eurovision Sponsorship Agreement") with the European Broadcasting Union (the "EBU"), the organizer of Eurovision. However, the EPP

2

Agreement was executed two weeks <u>after</u> the Eurovision Sponsorship Agreement by Moroccanoil Israel, not Plaintiff, and the contract contains no reference to Plaintiff whatsoever or to any explicit obligations owing to it.  EPP interacted primarily with Moroccanoil Israel in performing the contract largely in Israel, with some additional travel to Europe, and had minimal contact with any New York based employees of Plaintiff.  The fact that Plaintiff has now decided to proclaim itself a third-party beneficiary of the EPP Agreement because it prefers to have this dispute litigated in the United States does not somehow transform the EPP Agreement into a New York transaction of business subjecting Defendants to suit here.

Alternatively, the Court should dismiss this case in favor of the Israeli Litigation under the doctrine of forum non conveniens.  Numerous cases in this district have recognized Israel as an adequate alternative forum.  In the present case, it is clearly the preferred forum as the actual contracting parties are already litigating the relevant issues, which almost certainly turn on questions of Israeli law, before an Israeli Court.  Most of the key witnesses and documents are located in Israel.  Moreover, the deference due an American plaintiff's choice of forum is greatly diminished under the case law where, as here, it is doing business abroad as part of a concededly global enterprise and the underlying dispute bears little connection to the chosen forum.  Indeed, given that Plaintiff's owner (who also owns Moroccanoil Israel) regularly visits Israel, participated there in negotiating the EPP Agreement and ultimately chose to do business through his Israeli company with another Israeli entity, Plaintiff should hardly be heard to complain when disputes arising out that transaction are resolved in Israel.

## STATEMENT OF FACTS

The facts relevant to this motion are set forth in detail in the accompanying declaration of Tal Sarah Eshkoli ("Eshkoli Decl."), and they are summarized below for the Court's convenience.

### Background on Defendants and Their Lack of New York Contacts

Eshkoli is an Israeli citizen residing in Israel. Eshkoli Decl. ¶¶ 2-3. She manages the Israeli limited company EPP, which is headquartered in Jerusalem, Israel and owned by her two parents who are also residents of Israel. Id. EPP produces television and stage productions and other entertainment events in Israel and Europe, with its main specialty being events relating to Eurovision, a European song competition that Israel has participated in since 1973, won four times and hosted three times, including most recently in 2019. Eshkoli Decl. ¶ 2.

EPP has no offices in New York or anywhere else in the United States. It owns no property or bank accounts in New York or elsewhere in the United States. Its clients are located principally in Israel, and it does not have any clients located in New York or anywhere else in the United States, nor does it conduct business or advertise its services in the United States. Eshkoli Decl. ¶ 3.

### The Procurement of the Eurovision Sponsorship Agreement and the Negotiation of the EPP Agreement

A few days after the 2019 Eurovision ended in Israel, EPP commenced discussions with representatives of Moroccanoil Israel about introducing it to the EBU to help it obtain a long-term sponsorship agreement involving Eurovision. Eshkoli Decl. ¶ 4. At a May 23, 2019 meeting in Ramat Aviv, Israel, Eshkoli met with Moroccanoil Israel's CEO, David (Dedi) Cohen; one of its Director of Sales, Daniel Azrile; and Ofer Tal, the owner of Moroccanoil Israel, which according to the complaint in this case "is part of a global network of affiliated Moroccanoil companies," including Plaintiff, with offices in the United States, Canada, Israel

4

and Japan.  Eshkoli Decl. ¶ 5; Complaint ¶¶ 14-15.  At the meeting, Eshkoli explained why a Eurovision sponsorship could be a good opportunity for Moroccanoil Israel, and she was given approval to approach the EBU on its behalf about a possible Eurovision sponsorship.  Eshkoli Decl. ¶ 5.  The parties also discussed the consideration to be paid to EPP for introducing Moroccanoil Israel to the EBU and facilitating and helping to broker the transaction, as well as for Eshkoli's role in leading the project after execution of a long-term sponsorship agreement. Id.

During June and July 2019, Ms. Eshkoli attended several meetings with Messrs. Cohen, Azriel and Tal in Israel to discuss the terms of the EPP Agreement, in addition to a separate meeting in Israel with just Mr. Cohen.  Eshkoli Decl. ¶¶ 6-7, 11, 13.  During that time period, Moroccanoil Israel and EPP also exchanged communications and drafts of the agreement, while Eshkoli also advanced discussions with the EBU regarding the Eurovision Sponsorship Agreement.  Id. ¶¶ 8-10, 13.

On July 2, 2019, the Eurovision Sponsorship Agreement between Plaintiff and the EBU was fully executed.  In earlier drafts, which Eshkoli had exchanged back and forth between the EBU's representatives and Messrs. Cohen and Azriel, Moroccanoil Israel was named as the contracting party.  However, for reasons unknown to Defendants, the Eurovision Sponsorship Agreement was ultimately signed by Plaintiff instead of Moroccanoil Israel.  Id. ¶ 12.

Two weeks after the Eurovision Sponsorship Agreement was signed, the EPP Agreement between EPP and Moroccanoil Israel was fully executed.  Id. ¶¶ 15-16 & Complaint Ex. 2.  Even though Plaintiff was the named contracting party in the Eurovision Sponsorship Agreement, there is no reference in the EPP Agreement to Plaintiff or any explicit obligations owing to it.  Id. ¶ 17.  Instead, the EPP Agreement was entered into as a Hebrew-language agreement between two Israeli entities, providing for the payments to EPP to be made in the Israeli currency of New

5

Israeli Shekels and notices to be sent to the parties at their addresses in Israel. Id. ¶ 16. Under the EPP Agreement, EPP was to receive a commission for initiating the senior-level discussions between the EBU and Moroccanoil Israel and effectively brokering the Eurovision Sponsorship Agreement, as well as a commission for strategic consulting services to be provided by EPP exclusively in connection with the Eurovision sponsorship over ten years. Id.

## Performance of the EPP Agreement

EPP worked primarily with representatives of Moroccanoil Israel in performing EPP's strategic consulting services under the EPP Agreement. In that capacity, Eshkoli, in her position as EPP's manager, attended many meetings in Israel and some in Europe, but none in the United States. Although she made trips abroad to London and the Netherlands for purposes of performing EPP's obligations under the contract, she never traveled to New York or anywhere else in the United States for such purposes. Eshkoli Decl. ¶ 18.

From the outset, Yaniv Shapira, Moroccanoil Israel's VP of Marketing and PR, assumed responsibility for coordinating with Plaintiff and its various company departments as necessary. Eshkoli Decl. ¶ 19. Eshkoli had some limited contacts with individuals at Plaintiff located in the United States. Id. ¶ 20. However, she worked primarily with Messrs. Shapira and Azriel of Moroccanoil Israel. Mr. Shapira led all contacts with Plaintiff. Id.

Eshkoli participated from Israel in a very few limited Zoom meetings managed by Moroccanoil Israel between August and October 2019 during which members of Plaintiff were also present. Eshkoli Decl. ¶ 21. The discussions on these meetings did not involve any detailed planning efforts, as the day-to-day work with the Americans, Israeli heads of departments and distributors was managed by Mr. Shapira. Eshkoli was brought in on discussions with Israeli department heads and the distributors as Mr. Shapira determined was

6

necessary, and she provided general background about Eurovision and updates on developments during the Zoom calls and answered any questions. Id.

Defendants also assisted Moroccanoil Israel with a distributors conference, which took place in Tel Aviv, Israel between October 27 and November 1, 2019. Although some of Plaintiff's representatives came to the conference, she did not have any meetings with them during the conference. Eshkoli Decl. ¶ 22. A few months later, it became apparent that Mr. Cohen had decided to stop EPP's work, although he did not officially inform Defendants about it. He brought Americans from Plaintiff and Canadians from Moroccanoil Candada into the picture and asked that they take over and be trained. Id. ¶ 23. Eshkoli then had some brief interactions with individuals from Moroccanoil Israel, Moroccanoil Canada and Plaintiff to help effect the transition when it became clear that EPP's work was no longer desired. Id.

## The Present Dispute

Notwithstanding that the EPP Agreement provided for EPP to be paid its brokerage commission for procuring the Eurovision Sponsorship Agreement regardless of a termination of the EPP Agreement for any reason, Moroccanoil Israel refused to pay EPP its compensation. Eshkoli Decl. ¶¶ 24-25. In August 2020, EPP and Moroccanoil Israel, together with their Israeli attorneys, engaged in a voluntary mediation in Israel, but the mediation proved unsuccessful. Less than a week later and while EPP was preparing to file suit against Moroccanoil Israel in Israel for breach of contract, Plaintiff filed the present lawsuit in New York, claiming to be a third-party beneficiary of the EPP Agreement. Id. ¶ 25. EPP then filed suit against Moroccanoil in Israel for breach of contract. That case is currently pending. A preliminary hearing has already taken place and another one is scheduled for March 22, 2021 after the scheduled completion of discovery. Id.

## ARGUMENT

## DEFENDANTS' MOTION TO
## DISMISS SHOULD BE GRANTED

**I.      The Court Lacks Personal Jurisdiction Over Defendants**

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." Penguin Grp. (USA), Inc. v. Am. Buddha, 609 F.3d 30, 34-35 (2d Cir. 2010). To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(2) based on lack of personal jurisdiction, "a plaintiff must make a *prima facie* showing that jurisdiction exists." Id. Such a showing requires "making legally sufficient allegations of jurisdiction, including an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." Id. at 35 (internal quotations and alterations omitted).

Where, as here, a court sits in diversity, it applies the law of the forum state in determining whether personal jurisdiction exists over a defendant. See, e.g., Int'l Customs Assocs. v. Ford Motor Co., 893 F. Supp. 1251, 1259 (S.D.N.Y. 1995). Defendants are both based in Israel and they have no offices, property, bank accounts, clients or any other systematic business contacts with New York that could possibly subject them to general jurisdiction here under CPLR § 301.[1] Eshkoli Decl. ¶ 3. Accordingly, Plaintiff must establish specific jurisdiction over Defendants under the New York long-arm statute, which provides for jurisdiction over non-domiciliary defendants in certain circumstances with respect to causes of action arising out of various enumerated acts. See CPLR § 302.

In Plaintiff's response to Defendants' pre-motion letter (ECF No. 21), Plaintiff purports

---

[1] Under that statute, courts in New York can exercise jurisdiction in cases unrelated to a defendant's New York business activities where the defendant is "engaged in such a continuous and systematic course of 'doing business' [in New York] that a finding of its 'presence' in this jurisdiction is warranted." Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 77 N.Y. 2d 28, 33, 563 N.Y.S.2d 739, 741 (1990).

to rely on CPLR § 302(a)(1), which provides jurisdiction over a non-domiciliary who "transacts any business within the state" as to a cause of action arising out of that transaction of business. See, e.g., Int'l Customs Assocs., 893 F. Supp. at 1259 (CPLR § 302(a)(1) requires that defendant must "transact business" in New York and that claim must arise out of such business activity). Transacting business within the meaning of CPLR § 302(a)(1) "has been interpreted to require a certain quality, rather than a specific quantity, of contacts with New York." Broad Horizons, Inc. v. Central Crude Ltd., 1994 WL 623075, at *2, 1994 U.S. Dist. LEXIS 16045, at *7 (S.D.N.Y. Nov. 9, 1994). "Whether or not the contacts are of the appropriate nature must be determined by an analysis of the totality of the circumstances." United States Theatre Corp. v. Gunwyn/Lansburgh Ltd. Partnership, 825 F. Supp. 594, 596 (S.D.N.Y. 1993). Among the various factors to be considered in assessing whether a non-domiciliary transacts business in New York are (1) whether the defendant has an ongoing contractual relationship with a New York company; (2) whether the contract was negotiated or executed in New York and whether, after execution of the contract, defendant has visited New York to meet with parties to the contract regarding the relationship; (3) what the choice-of-law clause is in any such contract; and (4) whether the contract provides for notices and payments into New York or subjects the non-domiciliary to supervision by the corporation in New York. Tradition Chile Agentes De Valores Ltda v. ICAP Sec. USA LLC, 2010 WL 4739938, at *5, 2010 U.S. Dist. LEXIS 123673, at *13 (S.D.N.Y. Nov. 5, 2010) (citing Sunward Elecs., Inc. v. McDonald, 362 F.3d 17, 22 (2d Cir. 2004)).

      Analyzing the totality of the circumstances in the present case points overwhelmingly to the conclusion that Defendants did not transact business in New York. First and foremost, the relevant contract on which this entire dispute turns involves no contracting New York parties at all, but rather is a Hebrew-language agreement between two Israeli companies, EEP and

Moroccanoil Israel.  See, e.g., Tradition Chile Agentes, 2010 WL 4739938, at *5, 2010 U.S. Dist. LEXIS 123673, at *14 (employment agreement not a transaction of business in New York where no New York entity was a party to the agreement).  Moreover, any ongoing relationship centered around Eurovision, an event that is widely followed in Israel and Europe, but that has little or no recognition or significance to an audience in New York or anywhere else in the United States.  Eshkoli Decl. ¶ 17.  Under such circumstances, there is no basis to conclude that Defendants purposefully injected themselves into New York or otherwise intended to do business here by entering into an agreement with Plaintiff's Israeli affiliate.  See, e.g., Broad Horizons, 1994 WL 623075, at *5, 1994 U.S. Dist. LEXIS 16045, at *15 (no transaction of business in New York where "[t]he bulk of the contractual performance by both parties focused on the development, condition, and legal status of the mining claims, located in Canada"); Wilhelmshaven Acquisition Corp. v. Asher, 810 F. Supp. 108, 113 (S.D.N.Y. 1993) (no personal jurisdiction under CPLR § 302(a)(1) where the center of gravity of the transaction was an oil refinery in Germany).

Second, extensive face-to-face negotiations occurred entirely in Israel over the course of multiple meetings with employees of Moroccanoil Israel,[2] and the agreement was also executed by both parties in Israel.  See, e.g., Int'l Customs Assocs., 893 F. Supp. at 1261 (no transaction of business in New York where "[all of the face-to-face negotiations occurred in Taiwan, … the contract was executed in Taiwan," and all other negotiations and post-execution communications regarding the contract were conducted by wire and mail between New York and Taiwan).  Even

---

[2] Although Plaintiff's pre-motion response emphasizes that Mr. Tal, a New York resident, also participated in some of the discussions, it is important to note that he is not simply the owner of Plaintiff, but also of its Israeli subsidiary, and thus his involvement does not somehow change the deal into one with a New York based entity, particularly where he himself regularly visits Israel and participated in negotiations there concerning the EPP Agreement.

10

assuming *arguendo* that there may have also been any incidental telephone calls or emails into New York, as Plaintiff claims in its pre-motion response, these are of little or no legal relevance.[3]  "New York courts have consistently declined to sustain § 302(a)(1) jurisdiction solely on the basis of defendant's communication from another locale with a party in New York." Fiedler v. First City Nat'l Bank, 807 F.2d 315, 318 (2d Cir. 1986) (quoting Beacon Enterprises, Inc. v. Menzies, 715 F.2d 757, 766 (2d Cir. 1983)); see also Int'l Customs Assocs., 893 F. Supp. at 1261 ("Telephone calls and correspondence sent into New York, by a non-domiciliary defendant who is outside New York, generally are insufficient to establish personal jurisdiction.") (citing cases); Standard Enters., Inc. v. Bag-It, Inc., 673 F. Supp. 1216, 1220 (S.D.N.Y. 1987) ("Interstate telephone contacts do not generally have any great significance in § 302(a)(1) analyses."); Current Textiles Corp. v. Ava Indus., 624 F. Supp. 819, 821 (S.D.N.Y. 1985) ("In general, telephone conversations between litigants inside and outside of the state about the contract at issue will not sustain personal jurisdiction under section 302(a)(1) absent additional evidence that the out of state litigant purposefully availed himself of the privilege of conducting activities in New York State.").

 Not only did Defendants never come to New York in connection with the negotiation of the EPP Agreement, but they also never visited New York after the execution of the contract for the purpose of meeting with Plaintiff or anyone else regarding the relationship.  See, e.g., Tradition Chile Agentes, 2010 WL 4739938, at *5, 2010 U.S. Dist. LEXIS 123673, at *15 (no transaction of business in New York where contract was neither negotiated nor signed in New York, and defendant's travel to New York was "not for the purpose of meeting with parties to the contract regarding their relationship") (quotations omitted).  To the contrary, Defendants worked

---

[3] In fact, the negotiations that were not face-to-face also involved communications between two Israeli parties, Moroccanoil Israel and Defendants.  See Eshkoli Decl. ¶¶ 7, 9-10, 13.

principally with representatives of Moroccanoil Israel, and their only travel outside of Israel in performing the contract was to the United Kingdom and the Netherlands, not New York. Eshkoli Decl. ¶ 18. In this regard, Plaintiff's citation in its pre-motion letter to cases establishing the significance of the contract's place of performance is beside the point, as there is simply no basis on which to conclude that the EPP Agreement was to be performed in New York.

With respect to the third factor, the presence of a choice-of-law provision, the EPP Agreement is silent and thus provides no clarification either way. However, the center of gravity of the transaction concerning an agreement negotiated and signed in Israel between two Israeli companies, involving an event with no connection to the United States, points strongly in favor of applying Israeli law. See, e.g., Red Rock Holdings v. Union Bank Trust Co., 1998 WL 474094, at *10, 1998 U.S. Dist. LEXIS 12383, at *34-35 (S.D.N.Y. Aug. 10, 1998), aff'd without op., 181 F.3d 83 (2d Cir. 1999); see pp. 17-18 infra. It should also be noted that even where the relevant contract includes a New York choice of law clause – something that is decidedly not present here – courts have found this insufficient to establish personal jurisdiction when the other factors do not reflect a purposeful invocation by the defendant of the benefits and protection of New York laws. See, e.g., Tradition Chile Agentes, 2010 WL 4739938, at *7, 2010 U.S. Dist. LEXIS 123673, at *19 (no transaction of business in New York despite New York choice of law clause); Int'l Customs Assocs., 893 F. Supp. at 1260-61 (same).

Finally, the contract provided for payments to EPP to be made in New Israeli Shekels and for notices to be sent to the parties at their respective addresses in Israel, further militating against finding that Defendants transacted business in New York. See, e.g., Tradition Chile Agentes, 2010 WL 4739938, at *5, 2010 U.S. Dist. LEXIS 123673, at *15 (no transaction of business in New York where notices sent to parties in Chile and payment to be made in Chilean pesos); Int'l Customs Assocs., 893 F. Supp. at 1262 (no transaction of business in New York

12

where "any fees … under the agreement were to be paid in Taiwanese currency to a Taiwanese bank"). While Plaintiff's complaint seeks to create the illusion that the contract focused around interaction with Plaintiff's New York employees, the reality is there is no explicit reference to Plaintiff whatsoever in the agreement and certainly nothing that establishes supervision over Defendants in New York. Indeed, EPP performed its obligations by interacting largely with Moroccanoil Israel, as it naturally expected in negotiating and entering into an agreement with that entity in connection with an international event having no association with the American market.

The totality of the circumstances here establishes beyond question that Defendants did not transact business in New York. The EPP Agreement bears none of the traditional earmarks of purposeful New York activity required under CPLR 302(a)(1) -- no negotiations in New York, no pre-or-post contractual visits to New York, no New York parties to the agreement and no significant New York activities or connections to the underlying transaction. The complaint should thus be dismissed because Defendants are not subject to personal jurisdiction here.

## II. In the Alternative, the Court Should Dismiss Based on Forum Non Conveniens

Alternatively, the Court should dismiss this action on forum non conveniens grounds. "The decision whether to dismiss an action under the doctrine of forum non conveniens rests within the broad discretion of the district court." CCS Int'l v. ECI Telesystems, 1998 WL 512951, at *6, 1998 U.S. Dist. LEXIS 12755 at *17 (S.D.N.Y. Aug. 14, 1998). The first inquiry for purposes of a forum non conveniens analysis is whether there is an adequate alternative forum. Piper Aircraft Co. v. Reyno, 454 U.S. 235, 254 n.22 (1981). If there is such a forum, the Court must then balance the various private interest and public interest factors set forth by the Supreme Court in Gulf Oil Corp. v. Gilbert, 330 U.S. 501 (1947).

13

### A. Israel is an Adequate Alternative Forum

There can be no serious dispute here that Israel is an adequate alternative forum where Defendants are both located in Israel and there is currently a litigation involving the same issues pending there between the contracting parties to the EPP Agreement.  See, e.g., Red Rock Holdings, 1998 WL 474094, at *5, 1998 U.S. Dist. LEXIS 12383, at *16 ("an adequate alternative forum exists in this case because both defendants are Israeli corporations who are plainly subject to the jurisdiction of the Israeli courts, and, in fact, are currently litigating several cases arising from the same factual circumstances as this one in the Israeli judicial system."). Indeed, "numerous courts in this district have recognized that Israel is an adequate alternative forum for … breach of contract claims."  Kuehne & Nagel Inc. v. A.G.R. Eshcol Overseas, Ltd., 2014 WL 4059821, at *6, 2014 U.S. Dist. LEXIS 113657, at *13-15 (S.D.N.Y. Aug. 14, 2014) (citing cases).

### B. Analysis of the Gilbert Private and Public Factors Points Strongly in Favor of Israel as the More Convenient Forum

For purposes of analyzing the relevant Gilbert factors, the private factors include (1) the interest of the litigants in having the case tried in a particular forum; (2) access to sources of proof; (3) convenience of the willing witnesses; (4) availability of compulsory process for attaining the attendance of unwilling witnesses; and (5) all other practical problems that influence whether trial of a case will be easy, expeditious and inexpensive.  Gilbert, 330 U.S. at 508-09.  The public factors to be considered are (1) court congestion; (2) the interest of the forums in having local disputes decided at home; and (3) the interest in having issues of foreign law decided by a foreign tribunal.  Id.

#### 1. The Private Factors

While Plaintiff's choice of forum is entitled to some deference, its complaint acknowledges that Plaintiff "is part of a global network of affiliated Moroccanoil companies, that

14

maintain offices in Canada, Israel, and Japan….” Complaint (ECF No. 1) ¶ 14. "In the Second Circuit, the deference due an American plaintiff is diminished where plaintiff is a corporation doing business abroad and can expect to litigate in foreign courts." Flex-N-Gate Corp. v. Wegen, 2008 WL 5448994, at *3, 2008 U.S. Dist. LEXIS 105781, at *9 (S.D.N.Y. Dec. 29, 2008) (quotations omitted). Plaintiff here plainly can expect to litigate abroad given its own admission that it is part of a global network with offices around the world, including in Israel. See, e.g., Kuehne, 2014 WL 4059821, at *5, 2014 U.S. Dist. LEXIS at *13 ("While [plaintiff] is a New York corporation, it has offices around the world, including locations in Israel, Jordan and Dubai, and can expect to litigate abroad.").

In addition, "deference to a plaintiff's choice is diminished where the core operative facts upon which the litigation is brought bear little connection to the chosen forum." In re Alcon Shareholder Litig., 719 F. Supp. 2d 263, 269 (S.D.N.Y. 2010). Such is the case here. Despite Plaintiff's effort to interject itself into the dispute in order to exert additional leverage over the foreign Defendants, this case at its core involves a contractual dispute between two Israeli entities who negotiated and signed a Hebrew-language contract in Israel relating to an event with no ties to New York or anywhere else in the United States. See, e.g., Diatronics, Inc. v. Elbit Computers, Ltd., 649 F. Supp. 122, 128 (S.D.N.Y. 1986) (private factors point strongly to Israel as proper forum where agreements at issue were negotiated and executed in Israel and every significant event concerning transaction took place in Israel). Given "the lack of sufficient connections between this action and this district, [Plaintiff's] choice of New York as a forum is entitled to minimal deference." Kuehne, 2014 WL 4059821, at *6, 2014 U.S. Dist. LEXIS at *14.

With respect to the factors concerning access of proof and witnesses, it is clear "that most of the important witnesses and evidence needed for trial are located in Israel." See Diatronics,

15

649 F. Supp. at 129.  Not only were the agreements negotiated in Israel, but most of the individuals involved in the negotiation (Defendant Eshkoli, as well as Messrs. Cohen and Azriel of Moroccanoil Israel) are located there.  Eshkoli Decl. ¶¶ 4-14, 26.  Mr. Cohen is also an important witness with respect to performance of the EPP Agreement, as is Mr. Shapira of Moroccanoil Israel.  See Eshkoli Decl. ¶¶ 18-23, 26.  Key records relating to the negotiation of the EPP Agreement and EPP's performance under that contract are also located in Israel.  To the extent some relevant witnesses or records may also be located in the United States, it is reasonable to require those witnesses to appear and records to be produced in Israel.  See Diatronics, 649 F. Supp. at 129.  Mr. Tal regularly visits Israel and participated in several meetings there to negotiate the contract, and other employees of Plaintiff also traveled to Israel in connection with events relating to Eurovision.  See Eshkoli Decl. ¶¶ 5, 11, 13, 22.  Defendants never made a single trip to New York in connection with either the negotiation or performance of the EPP Agreement.

Finally, with respect to practical problems that would make a trial easy, expeditious and inexpensive, the fact that the original contract at issue is a Hebrew-language document will certainly render a trial in Israel more efficient.  Moreover, it is duplicative and unnecessary to address issues concerning whether Plaintiff is an intended third-party beneficiary of the EPP Agreement, when the Israeli Litigation can readily resolve the fundamental questions regarding whether there has been a breach and award appropriate relief directly between the actual contracting parties.  Thus, "[o]n balance, … the private factors tilt strongly in favor of dismissal of this action and trial in Israel."  CCS Int'l, 1998 WL 512951, at *10, 1998 U.S. Dist. LEXIS 12755, at *30.

### 2. Public Factors

The public factors similarly favor Israel as a more convenient forum than New York. The Southern District of New York is a heavily congested district. Meanwhile, the court in Israel has already held a preliminary conference, and discovery is scheduled to be completed by the time of the next conference in March 2021. Eshkoli Decl. ¶ 26.

Where the underlying contract in dispute was negotiated and signed in Israel between two Israeli companies, "the community in Israel has a greater interest in the dispute than the New York community has." Diatronics, 649 F. Supp. at 129; see also Red Rock Holdings, 1998 WL 474094, at *9, 1998 U.S. Dist. LEXIS 12383, at *30 (New York has "little interest" in case where core events of case took place in Israel). Moreover, given the presence of a separate action in Israel between the actual contracting parties, unburdened by extraneous issues concerning Plaintiff's alleged third-party beneficiary status, permitting the Israeli Litigation to proceed "would serve the interests of judicial economy by avoiding duplicative litigation." Id., 1998 WL 474094, at *10, 1998 U.S. Dist. LEXIS at *31; see also Diatronics, 649 F. Supp. at 129 (where action exists in Israel, "permitting the action in the United States to proceed would result in significant duplication of legal efforts by all parties").

And "[w]hile the Court need not definitively resolve the choice of law issue at this point, the likelihood that foreign law will apply weighs against retention of the action in the forum non conveniens inquiry." CCS Int'l, 1998 WL 512951, at *11, 1998 U.S. Dist. LEXIS 12755, at *32. Under the "center of gravity" or "grouping of contacts" approach applied by New York courts in determining choice of law for breach of contract claims, "courts may consider a spectrum of significant contacts, including the place of contracting, the places of negotiation and performance, the location of the subject matter, and the domicile or place of business of the contracting parties." Brink's Ltd. v. South African Airways, 93 F.3d 1022, 1031 (2d Cir. 1996).

Those factors here point strongly toward application of Israeli law.  The place of contracting, negotiation and domicile of the contracting parties are all Israel.  Moreover, performance of the contract occurred largely in Israel as well as in Europe, and the subject matter concerns a foreign event with connections to Israel and Europe, but not the United States.  "[B]ecause Israel has a significant interest in applying its law to a dispute involving the standards of conduct of contracting parties within its territory, this public factor tilts strongly in favor of dismissal." CCS Int'l, 1998 WL 512951, at *12, 1998 U.S. Dist. LEXIS 12755, at *35; see also Red Rock Holdings, 1998 WL 474094, at *10, 1998 U.S. Dist. LEXIS 12383, at *34-35 (finding Israeli law applied to breach of contract claims under "center of gravity" and "grouping of contacts" analysis).

*   *   *

Both the private and public factors decidedly favor dismissing this case in favor of litigation in Israel.  In contrast to the direct and obvious connections that a contractual dispute between two Israeli companies has to Israel, any connections to New York are entirely remote and appear to be solely contrived to try forcing the much smaller foreign entity to litigate in a distant and inconvenient location.  Whatever Plaintiff's alleged interest in the transaction is, it is undeniable that it chose to permit its Israeli affiliate to contract with an Israeli company.  It is thus entirely appropriate and to be expected that disputes arising out of that transaction should be resolved in Israel.  Accordingly, even if it were somehow possible to establish personal jurisdiction over Defendants, the Court should exercise its discretion under the forum non conveniens doctrine to dismiss the case in the interests of judicial economy, equity and basic fairness.

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss Plaintiff's complaint.

Dated: New York, New York
       December 11, 2020                         Respectfully submitted,

                                                 COWAN, LIEBOWITZ & LATMAN, P.C.
                                                 Attorneys for Defendants

                                                 By: *Richard S. Mandel*
                                                     Richard S. Mandel
                                                     Joel K. Schmidt
                                                     Raphael S. Nemes
                                                 114 West 47th Street
                                                 New York, New York 10036
                                                 (212) 790-9200

32293/001/3604883.3